J-A07034-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| STEVEN SUNEALITIS | |
| Appellant | No. 1239 WDA 2014 |

Appeal from the Judgment of Sentence March 13, 2014
In the Court of Common Pleas of Clearfield County
Criminal Division at No(s): CP-17-CR-0000713-2013

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MUNDY, J.

MEMORANDUM BY MUNDY, J.:                **FILED MAY 8, 2015**

Appellant, Steven Sunealitis, appeals from the March 13, 2014 aggregate judgment of sentence of eight to 16 years' imprisonment imposed after he was found guilty by a jury of deposits, stores, or disposes of chemical waste resulting from the manufacture of methamphetamine; manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance; intentional possession of controlled substance by person not registered; and use or possession of drug paraphernalia.[1]  After careful review, we are constrained to vacate Appellant's sentence and

---

[1] 35 P.S. §§ 780-113.4(b)(1), 780-113(a)(30), 780-113(a)(16), and 780-113(a)(32), respectively

remand for resentencing. We affirm Appellant's conviction on all other bases.

The trial court set forth the facts of this case as follows.

On May 13, 2013, at approximately 6:00 p.m., Agent James Shuttleworth of the Pennsylvania Board of Probation and Parole, along with Agent Donald Eisman, visited the home of [Appellant], located in Sandy Township, DuBois, Pennsylvania. The purpose of the visit was to drug test [Appellant] as part of the terms and conditions of his parole. While in [Appellant]'s home Shuttleworth requested a urine sample from [Appellant]. In response, [Appellant] informed Shuttleworth that he would test positive for methamphetamines, as he had "just snorted a line of meth." When asked by Agent Shuttleworth where the narcotics were obtained, [Appellant] stated that he manufactured the methamphetamine himself, in his home.

After this revelation, Shuttleworth began looking around [Appellant]'s residence in an attempt to find contraband. While conducting his search of the premises, Shuttleworth found what appeared to be methamphetamine in [Appellant]'s bedroom. [Appellant] later admitted that it was in fact methamphetamine when shown the substance by Shuttleworth. Agent Shuttleworth also searched the basement, where he discovered a melted soda bottle and some empty cold medicine capsules. Based upon his training and past experience, Shuttleworth believed that these items were traditionally utilized in employing the "shake and bake" method of manufacturing methamphetamines. Agent Shuttleworth then requested the Sandy Township Police to be present at the scene. Officers Erik Rupp and Travis Goodman responded to the call.

Before going back into [Appellant]'s home, the officers believed it to be prudent to acquire a search warrant. Later that night, a search warrant was granted and signed by the Honorable Jerome Nevling

- 2 -

at 12:00 a.m. on May 14, 2013. After attaining the warrant, the Sandy Township Police, along with a Clandestine Search Unit of the Pennsylvania State Police, went back to [Appellant]'s residence to search the premises. The State Police carried out the search at approximately 12:55 a.m. on May 14, 2013, as the Sandy Township Police force normally relies on the specialized skills and expertise of the State Police when dealing with the dangerous nature of methamphetamine labs.

The search uncovered copious items employed in the production of methamphetamine, including, but not limited to: a foam cooler that contained a plastic bottle containing pink crystals; an empty bottle of cold compresses and one empty pouch; a glass jar with stripped "AA" batteries; a plastic bottle with lighter fluid; blister packs of pseudoephedrine; a plastic bottle of drain opener; an empty bottle of Rooto drain cleaner; an instant cold pack; several empty blister packs; clear tubing; coffee filters; and a plastic Gatorade bottle that contained liquid waste from the manufacturing of methamphetamine.

As a result of the evidence that was discovered during that search, [Appellant] was charged with the [aforementioned] offenses []. The Commonwealth filed a [m]otion to [a]mend [i]nformation, on December 17, 2013, which asked th[e] [trial] [c]ourt to allow the Commonwealth to modify the [i]nformation to include facts relating to the aggregate weight of the compound or mixture of methamphetamine, pursuant to ***Alleyne v. United States***, 133 S.Ct. 2151 (2013). On January 7, 2014, the [trial] [c]ourt granted the Commonwealth's [m]otion, and a[] revised [i]nformation was filed on January 8, 2014. In relevant part, the new [i]nformation stated that "[t]he actor did manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance, methamphetamine, where the aggregate weight of the compound or mixture containing the substance involved *is at least 100 grams*." (Emphasis supplied).

- 3 -

To arrive at the aggregate weight of "at least 100 grams," the Commonwealth took into consideration the weight of the contents of the plastic Gatorade "cook bottle" found at [Appellant]'s residence during the State Police search. The "cook bottle" contained waste from the production of methamphetamine and trace amounts of methamphetamine. It was determined during the investigation by a State Police forensic scientist that the weight of the fluid, that contained waste liquid and methamphetamine, was approximately [288] grams.

[Appellant]'s jury trial was held on January 27 and 28, 2014. At trial[,] the Commonwealth presented evidence from the search of [Appellant]'s home. Specifically, the Commonwealth established that the substance found in [Appellant]'s bedroom was [0.05] of a gram of pure, ingestible methamphetamine located in [Appellant]'s bedroom. Also, recovered and presented at trial was, the above-mentioned, Gatorade "cook bottle" that contained waste fluid and methamphetamine in [] the aggregate amount of [288] grams. According to the testimony of Brett Bailor, a forensic chemist and qualified expert called by the Commonwealth, the contents of the plastic "cook bottle" were not ingestible, meaning that the liquid would be toxic if consumed. Mr. Bailor also expressed that a trace amount of methamphetamine was detectable in the waste mixture, but the exact amount of the drug was undeterminable. Lastly, Mr. Bailor testified that in the absence of highly-specialized tools, all of the methamphetamine found in the waste fluid could not be filtered from the waste product. Absent the trace amounts in the Gatorade bottle and tubing, and the small amount in [Appellant]'s bedroom, no other methamphetamine was recovered from [Appellant]'s residence.

Upon conclusion of the Commonwealth's case-in-chief, [Appellant]'s counsel made an oral motion for a [d]irected [v]erdict, arguing that the

Commonwealth had not presented sufficient evidence to the jury that would allow the members of the jury to find that [Appellant] possessed methamphetamine in the amount exceeding [100] grams, as stated in [Appellant]'s [i]nformation. The [trial] [c]ourt denied [Appellant]'s [m]otion, and the defense thus proceeded with presenting their case.

Upon the conclusion of the trial, the jury returned a guilty verdict that included a finding of an aggregate weight of a methamphetamine compound or mixture exceeding [100] grams. On March 11, 2014, [Appellant] appeared before the [trial] [c]ourt for sentencing. The [trial] [c]ourt sentenced [Appellant] in accordance with the guidelines and/or mandatory sentences relating to an aggregate weight in excess of [100] grams per 18 Pa.C.S.A. § 7508(a)(4)(iii).

Trial Court Opinion, 7/2/14, at 1-4.

On March 17, 2014, Appellant filed a post sentence motion. On July 2, 2014, the trial court entered an opinion and order denying said motion. On July 29, 2014, Appellant filed the instant timely appeal.[2]

On appeal, Appellant raises the following issues for our review.

> I. Whether the [trial] [c]ourt [] erred when, on January 13, 2014, it dismissed the Appellant's [m]otion to [s]uppress [e]vidence[?]
>
> II. Whether the [trial] [c]ourt erred when, on January 28, 2014, it accepted the guilty verdict of the jury despite a lack of sufficiency of evidence presented by the Commonwealth concerning the aggregate weight of a

_____

[2] The trial court and Appellant have complied with Pennsylvania Rule of Appellate Procedure 1925(b). Specifically, the trial court's August 7, 2014 letter directs this Court to its July 2, 2014 opinion.

> compound or mixture exceeding 100 grams, and subsequently sentenced the Appellant based upon the guilty verdict on March 11, 2014[?]
>
> III.     Whether the [trial] [c]ourt erred when, on July 2, 2014, it denied the Appellant's [p]ost-[s]entence [m]otion for [r]econsideration[?]

Appellant's Brief at 7.

Appellant's first issue challenges the denial of his motion to suppress.

Our standard of review is as follows.

> In addressing a challenge to a trial court's denial of a suppression motion, we are limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the Commonwealth prevailed in the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as it remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

***Commonwealth v. Scarborough***, 89 A.3d 679, 683 (Pa. Super. 2014) (citation omitted), *appeal denied*, 102 A.3d 985 (Pa. 2014).

Specifically, Appellant argues that the trial court erred in not suppressing unspecified physical evidence because the Sandy Township Police searched his residence before they acquired a search warrant. Appellant's Brief at 17-19. Appellant does not contest the warrant's validity.

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Similarly, the Pennsylvania Constitution provides that the "people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affined." Pa. Const. art. I, § 8. "Absent probable cause and exigent circumstances, warrantless searches and seizures in a private home violate both the Fourth Amendment and [] the Pennsylvania Constitution." **Commonwealth v. Gibbs**, 981 A.2d 274, 279 (Pa. Super. 2009), *appeal denied*, 3 A.3d 670 (Pa. 2010).

In its January 13, 2014 opinion denying Appellant's motion to suppress, the trial court found that the police did not search Appellant's house prior to obtaining a warrant even though Appellant had voluntarily consented to a search.

> Officers Erik Rupp and Travis Goodman of the Sandy Township Police Department arrived at the scene. When they arrived the officers entered into [Appellant]'s residence, as [Appellant] and the two parole agents were sitting in [Appellant]'s kitchen. Officer Rupp proceeded to ask [Appellant] if he would consent to a search of his home. Agent Shuttleworth expressed that at first [Appellant] was hesitant in giving permission, but later "gave Officer Rupp permission to search his residence." Officers

Rupp and Goodman also testified to the fact that consent was given by [Appellant].

However, Officer Rupp did not search [Appellant]'s dwelling at that precise moment. Shuttleworth and Rupp discussed the situation and decided that the officers would be more comfortable speaking to the District Attorney and obtaining a search warrant before commencing the search. After agreeing to this course of action, the agents removed [Appellant] from the premises and the officers exited the house. At approximately 7:30 p.m. that evening the parole agents transported [Appellant] to Indiana County Jail. Officer Goodman remained outside of the residence to secure the area, while Officer Rupp traveled back to the station to prepare the necessary paperwork to obtain a search warrant. Sergeant Kris Kruzelak came to the [Appellant]'s home while Officer Goodman was securing and monitoring the area around [Appellant]'s house. Sergeant Kruzelak stated that at no time during his presence on the premises, did any officers enter [Appellant]'s house. Officer Goodman further affirmed that no law enforcement personnel went back into the house after [Appellant] was removed from the property.

A search warrant was granted and signed by the Honorable Jerome Nevling at 12:00 a.m. on May 14, 2013. After attaining the warrant, Officer Rupp, along with a Clandestine Search Unit of the Pennsylvania State Police, went back to [Appellant]'s residence to search the premises. Officer Rupp averred that the search was carried out at approximately 12:55 a.m. on May 14, 2013.

…

The [trial] [c]ourt heard numerous witnesses, from both the Commonwealth and [Appellant], and believes that the search of [Appellant]'s home occurred *after* the police officers received the search warrant. Credible testimony from numerous witnesses supported this fact, including: Officer

- 8 -

Rupp; Officer Goodman; Agent Shuttleworth; and Sergeant Kru[z]elak. While the Deboers, the [Appellant]'s neighbors, may have seen activity [of police entering Appellant's residence before obtaining a search warrant] to bolster [Appellant]'s assertion, they never were actually on [Appellant]'s property and merely viewed what was occurring from their residence. Moreover, while [Appellant]'s sister allegedly observed the officers exiting [Appellant]'s basement, this assertion is overshadowed by the trustworthy and reliable testimony from several law enforcement professionals. Accordingly, the [trial] [c]ourt maintains that no officers entered [Appellant]'s home [for the purposes of searching the residence] prior to obtaining a search warrant and therefore the search was conducted in conformity with the Constitution.

The [trial] [c]ourt would further note that [Appellant] *expressly consented* to the search of his house. If officers obtain consent before entering a residence, a warrant is not needed. ***Commonwealth v. Scott***, 916 A.2d 695 (Pa. Super. 2007). In order to be valid, consent to conduct a search must be freely, specifically, unequivocally, and voluntarily given and must not be the product of any duress or coercion. ***Id.*** In this case, while the officers did not search the premises until after a search warrant was obtained, consent was given by [Appellant]. The officers were being cautious in waiting to obtain a warrant before entering [Appellant]'s home [to search it]. However, even if the officers did enter [Appellant]'s abode, the officers had [Appellant]'s express permission to do so. Agent Shuttleworth, Officer Rupp, and Officer Goodman all credibly expressed that [Appellant] gave them permission to search his home. There was absolutely no evidence or testimony presented at the hearings that would indicate that [Appellant]'s consent was a product of duress or coercion. Accordingly, even though the [trial] [c]ourt believes that the police officers did not search the home until after the receipt of the warrant, the officers had

express consent to do so, consent that was not browbeaten or forced from Defendant.

Trial Court Opinion, 1/13/14, at 2-3, 5-6 (emphasis in original).

Upon careful review, we conclude that the record supports the factual findings of the trial court. Specifically, the trial court's finding that police did not initiate a search of Appellant's home until after they obtained a search warrant was supported by the testimony of the parole agent and the police officers. Further, their testimony also supports the finding that Appellant consented to a search of the premises. The legal conclusions drawn from those findings are not erroneous. Accordingly, Appellant's first issue does not warrant relief. **See Scarborough**, **supra**.

Before addressing Appellant's remaining claims, we first proceed to consider the legality of Appellant's sentence, *sua sponte*. We begin by observing the following principles regarding waiver on appeal. Relevant to the instant case, "where application of a mandatory minimum sentence gives rise to illegal sentence concerns, even where the sentence is within the statutory limits, such legality of sentence questions are not waivable." **Commonwealth v. Valentine**, 101 A.3d 801, 809 (Pa. Super. 2014) (citation, brackets, and quotation marks omitted). "Legality of sentence questions … may be raised *sua sponte* by this Court." **Commonwealth v. Watley**, 81 A.3d 108, 118 (Pa. Super. 2013 (*en banc*), *appeal denied*, 95 A.3d 277 (Pa. 2014) (citation omitted). Finally, "a challenge to a sentence premised upon [the Supreme Court's decision in] **Alleyene** [v. **United**

*States*, 133 S.Ct. 2151 (2013)] likewise implicates the legality of the sentence and cannot be waived on appeal." *Commonwealth v. Newman*, 99 A.3d 86, 90 (Pa. Super. 2014) (*en banc*). Therefore, we address the issue of Appellant's sentence.

In examining the legality of a sentence on appeal, this Court employs the following standard of review.

> A challenge to the legality of a sentence … may be entertained as long as the reviewing court has jurisdiction. It is also well-established that if no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction. An illegal sentence must be vacated. Issues relating to the legality of a sentence are questions of law[.] … Our standard of review over such questions is *de novo* and our scope of review is plenary.

*Commonwealth v. Cardwell*, 105 A.3d 748, 750 (Pa. Super. 2014) (citations and quotation marks omitted).

Here, the trial court sentenced Appellant pursuant to the mandatory minimum statute at Section 7508(a)(4)(iii) after the jury found that the aggregate weight of the compound or mixture containing the controlled substance was 100 grams or more. N.T., 1/28/14, at 63; N.T., 3/11/14, at 8. Although the jury made the finding of the element beyond a reasonable doubt on a special verdict form, this Court in *Valentine* concluded that

**Newman** was still binding[3] and that it is solely within the province of the General Assembly to promulgate a new method of the imposition of mandatory minimum sentences in the Commonwealth. **Valentine**, **supra** at 811-812. Therefore, because the trial court utilized a facially unconstitutional statute in sentencing Appellant, the resulting sentence was illegal. Accordingly, we vacate the March 13, 2014 judgment of sentence and remand to the trial court, with instructions to resentence Appellant without consideration of the mandatory minimum sentence at Section 7508(a)(4)(iii), consistent with this memorandum.[4] In all other aspects, we affirm.

Convictions affirmed. Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

_____

[3] In **Newman** and its progeny, this Court has applied **Alleyne** and concluded the mandatory minimum sentencing schemes permitting a judge to find the factor triggering the imposition of a mandatory minimum by a preponderance of the evidence are facially unconstitutional as their subsections are not severable from each other. **See**, **e.g.**, **Commonwealth v. Fennel**, 105 A.3d 13, 20 (Pa. Super. 2014) (recognizing Section 7508 is facially unconstitutional in light of **Newman**).

[4] In light of our disposition, we need not consider Appellant's two remaining issues, challenging the application of Section 7508(a)(4)(iii) based on the weight of the methamphetamine being over 100 grams.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/8/2015